UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

       Plaintiff,

v.

HEIDI WASHINGTON, CARMEN McINTYRE,
JOHN DAVIDS, LYNN SANBORN, and/
C. GILFORD,

       Defendants.
_____/

Case No. 1:21-cv-331

Hon. Hala Y. Jarbou

**REPORT AND RECOMMENDATION**

*Pro se* plaintiff Joel Carter ("Carter"), a prisoner in the custody of the Michigan Department of Corrections (MDOC) filed this civil rights lawsuit against five defendants. *See* Compl. (ECF No. 1). This matter is now before the Court on defendants' motion for summary judgment (ECF No. 35) and Carter's motion for summary judgment (ECF No. 40).

**I.**  **Background**

Carter's lawsuit alleged that defendants at the Ionia Correctional Facility (ICF) exposed him to excessive heat during the summer of 2020. The defendants are MDOC Director Heidi Washington, MDOC Medical Director Carmen McIntyre, ICF Warden John Davids, ICF Deputy Warden Lynn Sandborn, and C. Guilford (later identified as ICF Facility Manager Chad Guilford). *See* Compl. (ECF No. 1); Opinion (ECF No. 8, PageID.119). Carter sued all defendants in their individual and official capacities. Compl. at PageID.3-4.

1

Carter's lawsuit involves two claims. First, defendants sealed off the windows at ICF which resulted in a lack of ventilation in his cell. Second, defendants denied Carter's request for a portable fan. The Court previously summarized Carter's allegations as follows:

> Plaintiff alleges that he has been classified as having a high risk of heat related injury because of his disabilities. Plaintiff states that in April of 2018, Defendant Washington ordered ICF officials to seal every cell window for security reasons, without regard for medically vulnerable prisoners who suffer from heat related illnesses. Plaintiff claims that Defendants Washington, Davids, Sandborn, and Gilford [sic] have knowledge of ventilation problems, but maintain an unlawful policy of confiscating portable fans.
>
> Plaintiff asserts that the action of sealing the cell windows has stopped the flow of fresh air and increased the occurrence of heat related illnesses. Because of the sealed windows, the fans in the hallway have no impact on the temperature in the cells, which can reach over 100 degrees.
>
> Plaintiff states that he suffers from multiple sclerosis, hypertension, and severe obesity. Plaintiff also suffers from psychosis, depression, and anxiety, and takes Risperdal and Prozac. Plaintiff states that both of these medications are known to impair the body's ability to regulate heat when temperatures rise above a heat index of 90 degrees.
>
> On June 10, 2020, Defendant Sandborn issued a heat reduction plan during a heat alert, which stated that all prisoner food slots would be opened during a heat alert upon a prisoner's request, except for the 10:00 p.m. to 6:00 a.m. shift. Plaintiff states that this procedure had no effect on the heat index in the cells, although it did increase ventilation. Plaintiff claims that unfortunately, some officers refused to open the slots for personal reasons and were allowed to close the slots for any reason in their discretion. Plaintiff also states that requiring the food slots to be closed on the 10:00 p.m. to 6:00 a.m. shift does not make sense because that is often when the cells are the hottest since they have retained heat from the day.
>
> On July 5, 2020, the temperature in Plaintiff's cell exceeded 94 degrees, causing him to suffer from difficulty breathing, panic attacks, hyperventilation, dizziness, headaches, and nausea, and exposed Plaintiff to an unnecessary risk of severe injury and death. Plaintiff continued to suffer under similar conditions throughout the summer months.
>
> Plaintiff alleges that Defendant McIntyre has an unlawful practice of denying accommodations, such as a fan, to heat sensitive prisoners. Plaintiff states that MDOC Policy Directive 04.07.112A prohibits level 5 prisoners from

2

> possessing a portable fan, with no exceptions for prisoners who suffer from heat related complications. However, prisoners in levels 1, 2, and 4 are allowed to possess one portable fan, and if they have a documented heat illness and are indigent, they may be provided with a fan at no cost to them.
>
> When Plaintiff was transferred to level 5, Defendants confiscated his fan and labeled it contraband. Plaintiff states that level 5 prisoners may possess appliances such as a television, typewriter, radio, media player, headphones, and one surge protector, none of which are medically necessary, so it makes no sense to prohibit prisoners like Plaintiff from possessing a fan. Plaintiff also contends that despite the policy prohibiting fans in level 5, at least one other level 5 prisoner has been allowed to possess a fan. Plaintiff states that the reality is that prison staff selectively enforce the practice of confiscating fans when they want to punish a prisoner for violating the rules, rather than enforcing the policy across the board.
>
> On June 22, 2020, Plaintiff submitted an "Offender ADA Reasonable Accommodation Request" to Defendant Gilford seeking a state issue portable fan for heat related illness. Defendant Gilford refused to process Plaintiff's request. On August 5, 2020, Plaintiff sent Defendant Gilford an ADA appeal, but Defendant Gilford refused to process the appeal. Plaintiff also filed a grievance on Defendant Gilford, which was rejected as non-grievable. Plaintiff complains that he should be allowed to grieve Defendant Gilford's refusal to process his request as a violation of MDOC policy. Plaintiff also asserts that he should be able to file an appeal directly with the Equal Employment Opportunity Administrator, rather than being required to first appeal to the ADA Coordinator.
>
> Plaintiff claims that Defendants violated his rights under Title II of the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and the Eighth and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

Opinion at PageID.119-121. The Court dismissed Carter's Fourteenth Amendment claim. *Id*. at PageID.131. Carter's ADA, RA, and Eighth Amendment claims against defendants Washington, McIntyre, Davids, Sanborn, and Guilford remain in the case. *Id*.

## II.    Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.   Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).   "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."   *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).   However, the Court is not bound to blindly adopt a non-moving party's version of the facts.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

4

motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Finally, Carter filed a verified complaint. *See* Compl. at PageID.15. This verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

### III.  Carter's request for injunctive relief

Carter's claim for injunctive relief is moot because he has been transferred from ICF. "A prisoner's transfer to a new facility moots claims for injunctive or declaratory relief arising from the particular conditions of confinement at the former prison. *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)." *Meeks v. Skipper*, No. 1:19-cv-161, 2020 WL 1067477 at *3 (Feb. 7, 2020), *R&R adopted*, 2020 WL 1064869 (W.D. Mich. March 5, 2020) (quoting *Whipple v. Millay*, No. 1:14-CV-00117, 2017 WL 4176339 at *4 (M.D. Tenn. Sept. 21, 2017)).

### IV.  Carter's motion for summary judgment (ECF No. 40)

Carter filed a combined motion for summary judgment and response to defendants' motion for summary judgment, which he signed and served by mail on November 15, 2022. Under the prison mailbox rule[1], the Court considers the motion filed on that date. Defendants contend that Carter's motion is untimely, pointing out that the case management order (ECF No. 23) required dispositive motions to be filed by no later than October 17, 2022. The Court agrees. Accordingly, Carter's motion for summary judgment (ECF No. 40) should be denied as untimely. However, the Court will consider Carter's brief as a response to defendants' motion.

---

[1] *See generally*, *Houston v. Lack*, 487 U.S. 266, 276 (1988) (under the federal prison mailbox rule, a prisoner's notice of appeal was "filed" at the time he "delivered it to the prison authorities for forwarding to the court clerk").

### V.  Defendants' motion for summary judgment (ECF No. 35)

Defendants seek summary judgment on all of Carter's claims.

### A.  Eighth Amendment claim

#### 1.  Legal standard

Carter seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Carter alleged that the decision to seal the cell windows at ICF and to deny Level 5 prisoners a portable fan during the summer months violated his Eighth Amendment rights. In its screening opinion, the Court set out the legal standard for this Eighth Amendment claim:

> The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting

6

*Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Id*.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).  The deliberate-indifference standard includes both objective and subjective components.  *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35-37.  To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety."  *Id*. at 837.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id*. at 842.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  *Id*. at 836.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id*. at 844.

In extreme circumstances, courts have found that inadequate ventilation may result in a sufficiently serious risk to prisoner safety under the Eighth Amendment.  *See, e.g., White v. Monohan*, 326 F. App'x 385 (7th Cir. 2009) (reversing district court dismissal of claim alleging that inadequate ventilation permitted temperatures to reach 110 degrees during the summer months); *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (finding that the Eighth Amendment was violated by a ventilation system that allowed summer temperatures to average in the 90s, unless prison officials took measures to ameliorate the heat by providing fans, ice water and daily showers); *Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) (allowing a prisoner's claim that his cell was "[s]aturated with the [f]umes of [f]eces (thrown by some inmates), the smell of urine and vomit as well as other stale body odors" to proceed).  However, absent such extreme conditions raising serious risks to prisoner health, courts routinely have determined that claims concerning ventilation were insufficient to state an Eighth Amendment claim.  *See, e.g.*, *Vasquez v. Frank*, 290 F. App'x 927 (7th Cir. 2008) (holding that ventilation that allegedly caused dizziness, migraines, nasal congestion, nose bleeds and difficulty breathing did not rise to the level of an Eighth Amendment violation); *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004) (citing cases and concluding that a ventilation system that allowed summer temperatures to average eighty-five or eighty-six degrees during the day and eighty degrees at night was not sufficiently extreme to violate the Eighth Amendment, where such temperatures were expected

7

and tolerated by the general public in Florida); *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (upholding the dismissal of a prisoner's claim that the confiscation of his extension cord, which was needed to operate a fan, deprived him of constitutionally adequate ventilation), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Bourrage v. McFarland*, No. 99-60923, 2001 WL 185034 (5th Cir. Feb. 6, 2001) (upholding dismissal of a prisoner's claim that inadequate ventilation had led to his prescription for an Albuterol Inhaler); *Jasman v. Schmidt*, 4 F. App'x 233, 235-36 (6th Cir. 2001) (affirming dismissal of a claim that the weatherstripping on the doors of the cells at a Michigan prison prevented air circulation and resulted in inadequate ventilation); *Davis v. Crowley*, No. 00-1475, 2000 WL 1871891 (6th Cir. Dec. 12, 2000) (concluding that a plaintiff's allegations that a ventilation system smelled strongly of gas did not allege a sufficiently serious harm where, despite his allegations that the fumes caused him to experience shortness of breath and watery eyes, the plaintiff failed to allege a substantial risk of serious harm); *Thompson v. Cty. of Medina*, 29 F.3d 238 (6th Cir.1994) (upholding a dismissal of pretrial detainees' claim that a jail had inadequate ventilation); *King v. Berghuis*, No.1:10-cv-57, 2010 WL 565373, at *3 (W.D. Mich. Feb. 13, 2010) (dismissing prisoners' claim alleging that ventilation system moves less than 10 cubic feet of air and caused headaches).

*Id*. at PageID.123-126.

### 2. Discussion

#### a. Ventilation and Heat Alerts

There is no evidence that the sealing of the windows at ICF in 2018 caused a lack of ventilation in Unit 5 (Carter's unit). Defendants presented the April 20, 2020 affidavit of Nick Clark, ICF's Physical Plant Manager (ECF No. 36-3, PageID.290-293). While Clark executed the affidavit for use in a different prisoner lawsuit, *Ade Brown v. Sabrina Davis, et al.*, 1:18-cv-812 (W.D. Mich.), the affidavit is equally applicable to the present case. In the affidavit, Clark pointed out his responsibilities as Physical Plant Manager and the operation of the ventilation system at ICF stating in pertinent part:

> 4. As the Physical Plant Manager, some of my responsibilities are to supervise maintenance staff, conduct inspections of building systems such as heating and cooling systems ("HVAC"), and ensure any necessary repairs are

> conducted. Additionally, I am involved in any changes to the ICF physical plant, such as the sealing shut of the Level V cell windows. . . .

*Id*. at PageID.290-291.   Among other things, Clark stated: that the cells in Units 2 through 5 have one HVAC vent to provide fresh air to the cells; that ICF maintenance staff conduct monthly inspections of the HVAC systems to ensure they are operating within their design parameters and do not require any maintenance; that "[t]he annual sanitation inspection notes the temperatures in each housing units, noise levels in the housing units, and whether there is sufficient ventilation in the cells"; that Unit 5 has two fans in each wing to provide additional air movement in the housing units and make the temperature more comfortable for the prisoners and the corrections officers; that "[i]n 2018, the cell windows in Level V housing at ICF were sealed shut because of security concerns;" that "[p]rior to sealing the windows shut, tests were conducted to ensure that the cells would receive sufficient ventilation without augmentation from open windows"; that "[d]uring the sanitation inspections of 2016, 2017, 2018, and 2019, the temperatures in the units ranged between 70- and 74-degrees Fahrenheit"; and, that "[t]he ventilation systems were noted to be working as designed during these sanitation inspections."   *Id*. at PageID.291-293.   In short, the cells in Unit 5 are ventilated through the HVAC system which was working as designed during the 2019 sanitation inspection.

However, even with ventilation, the MDOC recognizes that heat can pose a problem to the prisoners. Director Washington explained that the MDOC adopted an operating procedure to address heat related medical illnesses:

> Per MDOC Operating Procedure 03.04.100E (effective date 01/20/2020), all prisoners are at risk for heat-related illness. Accordingly, there are MDOC wide procedures in place for the prevention of heat-related illnesses to prisoners.   Per MDOC Policy Directive 04.07.112 (effective date 04/26/2021), prisoners at Security Levels I, II, and IV are allowed to possess one personal portable 6" fan.

9

> Prisoners at Security Level V are not allowed to possess personal fans based on security concerns.

Washington Interrogs. at PageID.444. Washington also explained that the current operating procedure excludes special accommodation notices for heat related illnesses:

> It has been determined that all prisoners are at risk for heat-related illness, therefore, procedures to prevent heat-related illnesses should be applied to all prisoners. As such, individual Special Accommodation Notices are no longer a part of the Operating Procedure.

*Id*. at PageID.445.

In this regard, during the summer of 2020 ICF officials declared eight "heat alerts" on July 5th, 8th, 9th, 18th, 26th, and 30th, as well as August 10th and 24th. Warden Davids Interrogs. (ECF No. 41-4, PageID.510-511). A heat alert is declared when the heat index is 90 degrees Fahrenheit or above as determined by the National Weather Service. *Id*. To address the heat alerts, Deputy Warden Sandborn sent a memorandum to the prisoners on June 10, 2020. With respect to conditions in the housing units, Sandborn stated: that food slots will be opened upon prisoner request in GP cells in Units 4-5 and on B-Wing of unit 3, except for the 10-6 shift; that fans will be turned on; that staff will ensure prisoners have access to and are advised to drink lots of water; that staff will direct prisoners not to wear cold weather gear such as coats and knit hats; and, that when announcing unit yards, the panel officer will also state there is a heat alert in effect and advise prisoners to limit running and strenuous physical activities and to drink lots of water. Heat Alert Notice (ECF No. 41-10, PageID.545). In addition, the notice advised that Health Care staff are to be contacted if a prisoner has or complains of any symptoms of a heat related illness, such as dizziness, muscle spasms, fainting, vomiting, nausea, change in appearance of the skin, or confusion. *Id*.

10

### b. Carter's claims against defendants

In seeking summary judgment, defendants contend that they had no personal involvement in the Eighth Amendment violations alleged in Carter's complaint. "Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011). *See Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999) ("It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions."). Because § 1983 liability requires personal involvement, "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability." *See West v. Michigan Department of Corrections*, No. 1:23-cv-436, 2023 WL 3734778 at *8 (W.D. Mich. May 31, 2023) (citing cases). As the Sixth Circuit explained:

> This court has held that § 1983 liability must be based on more than respondeat superior, or the right to control employees. *See Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). Thus, a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*.

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

### 1. MDOC Director Washington

Carter alleged that "Defendant Washington has ultimate responsibility for the promulgation and implementation of MDOC policies, procedures, and practices and for the management of MDOC" and that in this capacity "ordered ICF officials to seal every cell window for alleged security concerns, and without regard to medically vulnerable prisoners who suffer from heat-related illnesses." Compl. at PageID.3-4, ¶¶ 9, 14. Assuming that Director

11

Washington actually ordered ICF officials to seal windows,[2] there is no evidence that sealing the windows deprived ICF prisoners of ventilation.  *See* Clark Aff.  Accordingly, Director Washington should be granted summary judgment on the Eighth Amendment claim.

### 2. Dr. McIntyre

Carter alleged that "Defendant McIntyre has an unlawful practice of denying accommodations to heat sensitive prisoners." Compl. at PageID.6, ¶24.  When asked at his deposition how he reached this conclusion, Carter admitted that McIntyre had not denied him a specific accommodation, that he is suing McIntyre because she is the top health care person in the MDOC, that "the medical director is responsible for ensuring that health care patients are given a right of accommodation" and that "the health care staff states that they don't have to treat heat-related illnesses."  Carter Dep. at PageID.285-286.  Plaintiff's testimony does not establish any personal involvement by defendant McIntyre.[3]  Accordingly, Dr. McIntyre should be granted summary judgment on the Eighth Amendment claim.

### 3. ICF Deputy Warden Lynn Sandborn

Carter's specific allegation against Deputy Warden Sandborn is that the heat reduction plan for heat alerts is deficient:

> This practice has no effect for several reasons.  First, opening food slots only increases ventilation and does not reduce the heat index.  Second, "upon prisoner

---

[2] In this regard, Director Washington stated that she did not order or approve of the "ICF officers [sic] decision to seal cell windows" and was not involved in the cell window sealing project at ICF.  *See* Washington Interrogs. (ECF No. 36-6, PageID.443-444).  When defendants' counsel asked Carter "what information do you have that says Defendant Washington ordered this to happen?", Carter did not give a direct answer, stating that "administrative officials at that facility" notified him "that sealed windows couldn't be altered without the director's permission."  *See* Carter Dep. (ECF No. 36-2, PageID.278-279).  Carter did not recall the person's name, stating that he wrote it in his file but did not have that file with him.  *Id*. at PageID.279.

[3] In addition, as discussed, *supra*, issuance of individual special accommodation notices are no longer a part of the operating procedure for heat related illnesses.

>request" leaves discretion to the officer to ignore a prisoners' [sic] request, and some officers refuse to open a prisoner's slot for personal reasons. Third, a [sic] officer can close a prisoner's slot for any reason they deem necessary. Fourth, mentally ill prisoners are often unable to recognize the need to make the request. And Fifhth [sic], the "except 10 – 6 shift", is third shift when temperatures in the cell is [sic] at its high point from retaining heat through the day.

Compl. at PageID.6, ¶ 22. Carter presents no evidence that the operation of the heat reduction plan caused him injury. Carter's claim against Sandborn is essentially one of respondeat superior, based on the speculation that some corrections officers may refuse to open the food slots as directed. Accordingly, Deputy Warden Sandborn should be granted summary judgment on the Eighth Amendment claim.

### 4. ICF Warden Davids

Carter alleged that defendant Warden Davids had knowledge of ongoing ventilation problems at ICF, that the ventilation system constantly shuts down, and that the warden orders maintenance staff to clean out the ventilation ducts once a year. Carter's allegation that Warden Davids knew about the operation of the ventilation system and ordered staff to perform maintenance on the system does not establish that Davids was personally responsible for the alleged lack of ventilation in Carter's cell. As discussed, *supra*, ICF's Physical Plant Manager is the person responsible for operation of the ventilation system. See Clark Aff. (ECF No. 36-3). Finally, Carter's allegation that the warden ordered staff to perform annual maintenance on the ventilation system is evidence that the warden took steps to keep the ventilation system in good operating condition. Accordingly, Warden Davids should be granted summary judgment on the Eighth Amendment claim.

### 5.   ICF Facility Manager Guilford

The record reflects that defendant Guilford had personal involvement with Carter's request for a fan. Carter alleged that he submitted accommodation requests to Guilford seeking a state issued portable fan for heat related illness and that Guilford refused to process request. The Court construes the request for a portable fan as relevant to claims brought pursuant to the Eighth Amendment, the ADA, and the RA.

To satisfy the objective prong of an Eighth Amendment claim, Carter must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Here, the Court construes the ICF's declaration of eight heat alerts as evidence that all of the prisoners at the facility were subject to a substantial risk of serious harm due to heat related medical problems for eight days during the summer of 2020. Such a risk is unavoidable; the MDOC cannot control the weather. Based on these facts, the Court concludes that Carter has established the objective prong of an Eighth Amendment claim to the extent that weather conditions created a substantial risk of serious harm due to heat related medical problems.

Next, the Court must determine whether Carter established the subjective prong of his Eighth Amendment claim against ICF Facility Manager Guilford. Under the subjective prong, an official must know of and disregard an excessive risk to inmate health or safety. *See id*. at 837. Defendants contend that Carter's Eighth Amendment claim fails

> because he has presented no evidence that any of the Defendants were subjectively aware of the conditions he was allegedly experiencing. Nowhere does Carter say that he spoke to or otherwise directly communicated with . . . Defendant Guilford about these alleged conditions.

Defendants' Brief (ECF No. 36, PageID.263). Contrary to defendants' contention, Carter alleged in his verified complaint that he submitted two Offender ADA Reasonable Accommodation

14

Request/Appeal forms to defendant Guilford asking for a fan due to his medical history. *See* ADA Requests (ECF Nos. 1-1, PageID.19-20); Compl. at PageID.8-9.[4]

The record reflects that before the MDOC adopted procedures to protect all prisoners from heat-related illnesses (MDOC Policy Directive 04.07.112), MDOC personnel had issued Carter special accommodations for being at risk of heat related illnesses in 2013 and 2018. *See* Special accommodations (ECF No. 41-13, PageID.559-560). Specifically, on August 8, 2016, MDOC personnel ordered Carter a fan due to his multiple sclerosis (MS), *i.e.*, "08/08/2016 Housing: Fan for cell due to MS". *See* Intrasystem Transfer Summary (ECF No. 41-14, PageID.563). This special accommodation is evidence that Carter had a medical condition (MS) which made him susceptible to heat related illnesses in his cell. According to his verified complaint, Carter faced a serious health risk because he had a medical need for a fan, but was not allowed to possess the fan as a Level V prisoner.

In the first ADA form, Carter described the programs, services or activities he was requesting as, "Breathing; Lack of ventilation; Fresh Air." ADA Request (June 22, 2020) (PageID.19). Carter described his limitations as,

> I suffer from MS; Hypertension; Obesity; and have a history of asthma. I have a Heart-Related illness. I am having trouble breathing, there is no exhaust vent within the cell, and I have no access to fresh [sic] in temperatures above 90 [] degrees.

*Id*. Carter requested a reasonable accommodation of "a fan". *Id*. In the second ADA form, Carter described the programs, services or activities he was requesting as,

> A portable fan: breathing ventilation: fresh air. This is an appeal. The ADA Coordinator refused to process my multiple request.

---

[4] *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

15

ADA Request (Aug. 5, 2020) (PageID.20).   Carter described his limitations as,

> I suffer from Multiple Sclerosis and High Blood Pressure.   I am classified high-risk for Heat-Related illness.   I'm having trouble breathing, there is a lack of oxygen and fresh air because there is no exhaust vent in the cells.   Temperature are above 90 [ ] degrees.

*Id*.   Carter requested a reasonable accommodation of "a portable fan".   *Id*.

Defendant Guilford does not rebut Carter's verified allegations, his medical history of MS, or the 2016 previous special accommodation order which found that Carter had a medical need for a fan due to MS.   *See* Defendants' Brief at PageID.267.   Viewing this record in the light most favorable to the non-moving party (Carter), a genuine issue of material fact exists with respect to the subjective prong of Carter's Eighth Amendment claim against defendant Guilford, *i.e.*, that Guilford knew of and disregarded an excessive risk to inmate health or safety.   Accordingly, Facility Manager Guilford's motion for summary judgment should be denied as to the Eighth Amendment claim.

### B.    ADA and RA claims

Carter alleged "that Defendants violated his rights under Title II of the ADA, 42 U.S.C. §§ 12131-12165, which applies to public entities, as well as under the Rehabilitation Act."   Opinion at PageID.122.   As this Court previously explained,

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   Discrimination against a "qualified individual on the basis of a disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]"   42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case under the ADA for failure to

> accommodate a disability, the plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the service, with or without reasonable accommodation; (3) the defendants knew or had reason to know of his disability; (4) he requested an accommodation; and (5) the defendants failed to provide the necessary accommodation. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

*Id*. at PageID.122-123. The Court also explained that,

> Similarly, § 504 of the RA provides in pertinent part:
>
>> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
>
> 29 U.S.C. § 794(a). "Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act . . . claims brought under both statutes may be analyzed together." *Thompson v. Williamson County*, 219 F.3d 555, 557, n. 3 (6th Cir. 2000) (citing *Maddox v. University of Tenn.*, 62 F.3d 843, 846, n. 2 (6th Cir. 1995)).

*Id*. at PageID.122, fn. 1.

The Court found that the allegations in Carter's verified complaint were sufficient to establish claims under both the ADA and the RA. In reaching this determination, the Court concluded that Carter's alleged medical conditions constituted a disability and that being "housed in a manner that did not threaten his health" was a service:

> Plaintiff's alleged diagnoses include multiple sclerosis, hypertension, and severe obesity. Plaintiff also suffers from psychosis, depression, and anxiety, and takes Risperdal and Prozac, and that these medications are known to impair the body's ability to regulate heat when temperatures rise above a heat index of 90 degrees. Assuming that Plaintiff's conditions fall within the definition of "disability," Plaintiff has alleged facts that suggest that he was deprived of an accommodation, a fan, that would allow him to be housed in a manner that did not threaten his health. Because Plaintiff has alleged that a fan was a necessary accommodation for his disability, his ADA and RA may not be dismissed on initial

>  review. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008).

*Id*. at PageID.123.

"[T]he proper defendant under a Title II claim is the public entity or an official acting in his official capacity." *Everson v. Leis*, 556 F.3d 484, 501 fn. 7 (6th Cir. 2009). As discussed, Carter has sued all five defendants in their individual and official capacities. Here, defendants seek summary judgment on two grounds. First, defendants contend that Carter has not presented sufficient evidence to show that he suffers from a qualifying disability under the ADA and RA.[5] Under the ADA, the term disability means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Defendants do not develop this argument. As discussed, back in 2016 the MDOC determined that Carter required a fan in his cell as a special accommodation due to his MS. Defendants do not address this medical history. While defendants refer to medical evidence (*e.g.*, "Carter's medical records indicate that he has no physical limitations or restrictions," citing Defs.' Ex. D, Carter 2020 Medical Records p. 56-61)[6], they do not explain the contents or significance of the evidence. Defendants' Brief at PageID.269. Based on this record, the Court concludes that defendants have failed to meet their burden with respect to the qualifying disability.

---

[5] Defendants point out that "[p]ursuant to 29 U.S.C. § 794(d), the definitions under the American[s] with Disabilities Act of 1990, 42 U.S.C. § 12111, apply to the Rehabilitation Act," citing *Roetter v. Michigan Department of Corrections*, 456 Fed. Appx. 566, 570 (6th Cir. 2012). *See* Defendants' Brief at PageID.268.

[6] Presumably, defendants are referring to the Medical Detail Special Accommodations and Devices and Equipment at PageID.435-441 (numbered Page 57 through 63).

Second, defendants contend that Carter has not offered sufficient evidence to establish a genuine dispute that "by reason of such disability" he was "excluded from participation in" or "denied the benefits of the services, programs, or activities of a public entity."  42 U.S.C. § 12132.  The Court's initial screening opinion viewed the service provided by the MDOC as housing Carter "in a manner that did not threaten his health".   In 2016 the MDOC recognized that Carter needed a fan as a medical accommodation for his MS.  While the MDOC changed its operating procedures to exclude individual special accommodations for heat related illnesses, Carter's diagnosis of MS did not change.   Viewing the evidence in the light most favorable to the non-moving party (Carter), a genuine issue of material fact exists as to whether the MDOC's failure to provide Carter with a fan to accommodate his MS violated the ADA, the RA, or both.  For these reasons, defendants' motion for summary judgment should be denied as to Carter's claims under the ADA and the RA.

**VI.     Recommendation**

Accordingly, I respectfully recommend that Carter's motion for summary judgment (ECF No. 40) be **DENIED**.

I further recommend that defendants' motion for summary judgment (ECF No. 35) be **GRANTED** as to Carter's Eighth Amendment claims alleged against defendants Washington, McIntyre, Davids, and Sandborn, and **DENIED** as to Carter's Eighth Amendment claim against defendant Guilford.

I further recommend that defendants' motion for summary judgment (CF No. 35) be **DENIED** as to plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act.

Dated: July 31, 2023                            /s/ Ray Kent
                                                RAY KENT
                                                United States Magistrate Judge

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.   All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).