UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

    Plaintiff,

v.

HEIDI WASHINGTON, et al.,

    Defendants.
_____/

Case No. 1:21-cv-331

Hon. Hala Y. Jarbou

# **OPINION**

Plaintiff Joel Marcel Carter is an inmate currently incarcerated with the Michigan Department of Corrections ("MDOC") at the Macomb Correctional Facility (MRF) in Macomb County, Michigan. The events about which he complains took place when he was an inmate at the Ionia Correctional Facility (ICF) in the summer of 2020. Carter brings suit against MDOC Director Heidi Washington, MDOC Medical Director Carmen McIntyre, ICF Warden John Davids, ICF Deputy Warden Lynn Sanborn, and ICF Facility Manager Chad Guilford in their individual and official capacities. He asserts claims under 42 U.S.C. § 1983 for deliberate indifference in violation of his Eighth Amendment rights, and under the Americans with Disabilities (ADA) and Rehabilitation (RA) Acts. On July 31, 2023, the magistrate judge issued a Report and Recommendation ("R&R") addressing the pending cross-motions for summary judgment (ECF No. 53). The R&R recommended: (1) that Plaintiff Carter's motion for summary judgment be denied in full; (2) that Defendants' motion for summary judgment as to Defendants Washington, McIntyre, Davids, and Sanborn be granted on Carter's Eighth Amendment claims and be denied as to Defendant Guilford; and (3) that Defendants' motion for summary judgment as to the ADA and RA claims be denied.

Before the Court are Washington, McIntyre, Davids, Sanborn and Guilford's objections to the R&R (ECF No. 54), as well as Carter's objection to the R&R (ECF No. 56).

## I. FACTUAL BACKGROUND

Over the course of the summer of 2020, ICF officials issued eight "heat alerts" on July 5, 8, 9, 18, 26 and 30 and August 10 and 24. (Davis Interrogs., ECF No. 41-4, Page ID.510-511.) A heat alert is called when the heat index -- measured using National Weather Service data -- reaches 90 degrees Fahrenheit. (*Id.*) As of the summer of 2020, Plaintiff was housed on ICF Level V, the highest security level at ICF.

In the spring of 2018, a determination was made that the windows in each cell on ICF Level V should be sealed shut in response to security threats. (Carter Dep. 4. ECF No. 36-2.) At the time this determination was made, internal concerns were raised about the effects of sealing the windows on ventilation and summer temperatures in the cells on Level V. (Window Sealing Mem., ECF No. 41-8, PageID.529.) In response, ICF staff ran tests on the cells to determine whether the ventilation complied with MDOC standards when the windows were closed. After running tests, the program manager determined that even the cells with the lowest airflows met the proper ventilation thresholds. (*Id.*, PageID.541.)

On June 10, 2020, Deputy Warden Sanborn issued a heat reduction plan that was to be followed during heat alerts. (Sanborn Mem., ECF No. 41-10.) This plan laid out a new standard operating procedure in response to high temperatures. It included such measures as recommending inmates not engage in strenuous activity outdoors, staff advising inmates to drink water and refrain from wearing winter clothes, turning on the unit-wide fans, and opening the food slots "except for the 10-6 shift." (*Id.*)

Carter suffers from numerous ailments and illnesses, some of which cause him to be particularly susceptible to heat-related illness. (Carter Med. R., ECF No. 41-2.) MDOC policy in

2

place until at least 2018 identified several risk factors for heat-related illness that justified special accommodations. (MDOC Operating Proc., ECF No. 41-18. PageID.587.) Carter possesses several of these risk factors, including taking antipsychotic medication and tricyclic antidepressants, morbid obesity, and a chronic degenerative CNS disease (Carter suffers from multiple sclerosis ("MS")). (Carter Med. R., ECF No. 41-2.) Before a policy change removing susceptibility to heat-related illness from the list of ailments that warrant special accommodations, (Washington Interrogs., ECF No. 41-12, PageID.556), Plaintiff was allowed to possess a portable fan to mitigate his heat sensitivity due to MS. (Carter Transfer Summary, ECF No. 41-14, PageID.563.) Once Carter was moved to Level V, he alleges in his verified complaint that his portable fan was confiscated. (Compl. ¶ 27. ECF No. 1.)

On June 22, 2020, Carter sent an accommodation request to the ICF ADA coordinator. (Carter Aff., ECF No. 1-1. PageID.19.) In his request, he listed his limitations as "MS; hypertension; obesity; and have a history of asthma. I have a Heat-Related illness. I am having trouble breathing, there is no exhaust vent within the cell, and I have no access to fresh [air] in temperatures above 90 degrees." (*Id*.) According to Carter, his ADA request was never processed. (Compl. ¶ 32.) He sent an appeal on August 5, 2020, which he, again, says was never processed. (Compl. ¶ 34; Carter Aff., PageID.20.) Carter also filed a grievance against the ADA Coordinator, Defendant Guilford, for refusing to process his request. (Carter Grievance, ECF No. 41-21, PageID.601-602.) His grievance was denied as a non-grievable policy issue. His appeal to Warden Davids was also denied. (*Id*., PageID.605.)

## II. LEGAL STANDARDS

### A. Review of Objections

Under Rule 72 of the Federal Rules of Civil Procedure,

3

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249 (citing *First Nat'l Bank of Ariz v. City Serve. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id*. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021). "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id*. at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### III. CARTER'S REQUEST FOR SUMMARY JUDGMENT

Carter filed a motion for summary judgment on November 15, 2022. Defendants argue that this motion was untimely as the case management order (ECF No. 23) called for all dispositive

4

motions to be submitted to the Court no later than October 17, 2022. The Court agrees. Accordingly, Carter's motion for summary judgment will be denied as untimely.

## IV. ANALYSIS

### A. Eighth Amendment Claim

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-346 (1981). The Amendment prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, F.2d 950, 954 (6th Cir. 1987 (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Id*.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S.

5

at 35-37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 411 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id*. at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id*. at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844.

In extreme circumstances, courts have found that inadequate ventilation may result in a sufficiently serious risk to prisoner safety under the Eighth Amendment. *See, e.g., White v. Monohan*, 326 F. App'x 385 (7th Cir. 2009) (reversing district court dismissal of claim alleging that inadequate ventilation permitted temperatures to reach 110 degrees during the summer months); *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (finding that the Eighth Amendment was violated by a ventilation system that allowed summer temperatures to average in the 90s, unless prison officials took measure to ameliorate the heat by providing fans, ice water, and daily showers); *Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) (allowing prisoner's claim that his cell was "[s]aturated with the [f]umes of [f]eces (thrown by some inmates), the smell of urine and vomit as well as other stale body odors" to proceed). However, absent such extreme conditions raising serious risk to prisoner health, courts routinely have determined that claims concerning ventilation were insufficient to state an Eighth Amendment claim. *See, e.g.*, *Vasquez v. Frank*, 290 F. App'x 927 (7th Cir. 2008) (holding that ventilation that allegedly caused dizziness, migraines, nasal congestion, nose bleeds and difficulty breathing did not rise to the level of an

Eighth Amendment violation); *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004) (citing cases and concluding that a ventilation system that allowed summer temperatures to average eighty-five or eighty-six degrees during the day and eighty degrees at night was not sufficiently extreme to violate the Eighth Amendment, where such temperatures were expected and tolerated by the general public in Florida); *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (upholding the dismissal of a prisoner's claim that the confiscation of his extension cord, which was needed to operate a fan, deprived him of constitutionally adequate ventilation), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Bourrage v. McFarland*, No. 99-60923, 2001 WL 185034 (5th Cir. Feb. 6, 2001) (upholding dismissal of a prisoner's claim that inadequate ventilation had led to his prescription for an Albuterol inhaler); *Jasman v. Schmidt*, 4 F. App'x 233, 235-36 (6th Cir. 2001) (affirming dismissal of a claim that the weatherstripping on the doors of cells at a Michigan prison prevented air circulation and resulted in inadequate ventilation); *Davis v. Crowley*, No. 00-1475, 2000 WL 1871891 (6th Cir. Dec. 12, 2000) (concluding that a plaintiff's allegations that a ventilation system smelled strongly of gas did not allege a sufficiently serious harm where, despite allegations that the fumes caused him to experience shortness of breath and watery eyes, the plaintiff failed to allege a substantial risk of serious harm); *Thompson v. City of Medina*, 29 F.3d 238 (6th Cir. 1994) (upholding dismissal of pretrial detainees' claim that a jail had inadequate ventilation); *Kind v. Berghuis*, No. 1:10-cv-57, 2010 WL 565373, at *3 (W.D. Mich. Feb 13, 2010) (dismissing prisoners' claim alleging that ventilation system moves less than 10 cubic feet of air and causes headaches).

### 1. Ventilation

The R&R separated Carter's Eighth Amendment claim into two separate issues, lack of ventilation and excessive heat. The R&R correctly found that there was no evidence that sealing the windows at ICF caused a lack of ventilation in Carter's unit.  Before the Level V windows

7

were sealed shut in 2018, MDOC staff raised concerns about the effect of sealing the windows on ventilation in the prisoners' cells. (Cell Window Sealing Mem., PageID.529.) In response to these concerns, the ICF Physical Plant Superintendent, Donald Dine, ran tests on the ventilation in the cells with the windows closed. (Dines Decl., ECF No. 42-1, PageID.636.) He found that not only were the cells receiving adequate fresh air with the windows closed, but "[t]he tests showed that there was no reduction on the supply of fresh air to the cells when the windows were closed compared to when they were open." (*Id*. ¶ 5.) The declaration of Superintendent Dines is backed up by contemporary email exchanges between MDOC staff regarding the results of the test. (08/06/2018 Emails, ECF No. 42-9, PageID.541.) Carter objects to the conclusion that there was no ventilation problem in ICF Level V, arguing that it "credits the affidavit executed by Nick Clark and disregards the affidavit of Plaintiff and his verified complaint, and numerous witnesses." (Pl.'s Objs. to R&R, ECF No. 56, PageID.729-730.) However, Carter provides no evidence for his claim of insufficient ventilation in his complaint beyond speculation from the fact that the windows were sealed shut. On the other side are an affidavit from a prison official, a declaration from the facilities superintendent, and contemporary internal email exchanges between prison staff discussing the results of ventilation tests with the windows closed. (Clark Aff., PageID.293; 08/06/2018 Emails, PageID.541; Dines Decl. ¶ 5.) Carter offers nothing that would create a genuine dispute of fact. Accordingly, the magistrate did not err in finding that there was no evidence Carter's cell lacked proper ventilation in the summer of 2020.

### 2. Heat Alerts

The R&R correctly reasoned that while there was no evidence of a lack of ventilation in Carter's cell, there was tangible evidence that there was sufficient heat to pose a danger to Carter on at least eight occasions over the course of the summer of 2020. (Davis Interrogs., PageID.510-

511.) Recognizing the danger excessive heat might play on all inmates' health, the MDOC adopted an operating procedure to address heat-related illnesses among prisoners.

> Per MDOC Operating Procedure 03.04.1000E (effective date 1/20/2020), all prisoners are at risk for heat-related illness. Accordingly, there are MDOC wide procedures in place for the prevention of heat-related illnesses to prisoners. Per MDOC Policy Directive 04.07.112 (effective date 04/26/2021), prisoners at Security Levels I, II, and IV are allowed to possess one personal portable 6" fan. Prisoners at Security Level V are not allowed to possess personal fans based on security concerns.

(*Id.*, PageID.444.) Washington went on to explain that the current operating procedure no longer included special accommodations for heat-related illness.

> It has been determined that all prisoners are at risk for heat-related illness, therefore, procedures to prevent heat-related illnesses should be applied to all prisoners. As such, individual Special Accommodation Notices are no longer part of the operating procedure.

(*Id.*, PageID.445.)

It can be inferred that, since ICF officials called heat alerts when temperatures reached levels that could be considered dangerous to inmates, and since all prisoners were at risk of heat-related illness at times when there were heat alerts called, there was a substantial risk to all inmates' health or safety. This analysis holds without reaching the question of whether Carter was more susceptible to heat-related illness than the already universally at-risk prison population.

### 3. Claims Against Defendants Washington, McIntyre, Sanborn, and Davids

The R&R recommended dismissing the Eighth Amendment claims against Defendants Washington, McIntyre, Sanborn, and Davis because Carter could not establish personal involvement in the alleged Eighth Amendment violations. Carter objects to the recommended dismissal of each. The Court agrees with the R&R that the Eighth Amendment claims against Washington, McIntyre, Sanborn, and Davids should be dismissed.

9

### (a) MDOC Director Washington

The R&R concluded that Carter's claims against Director Washington were insufficient because, "[a]ssuming that Director Washington actually ordered ICF officials to seal windows, there is no evidence that sealing the windows deprived ICF prisoners of ventilation." (R&R, PageID.712.)  This applies to heat, as well. Although Plaintiff does present evidence of dangerous heat, there is no evidence that the sealing of the windows led to this development.  Plaintiff further claims that Director Washington also implemented the policy to confiscate his fan. (Pl's Obj. to R&R, PageID.731.)  He claims that Director Washington "created policy Directive, 04.07.112A," which states that Level I, II, and IV prisoners can have a fan, while Level V prisoners cannot. (*Id*.) That policy had an effective date of 04/26/2021, nearly a year after the complained-of events. (Washington Interrogs., PageID.444.)  Therefore, it has no bearing on the facts alleged. Moreover, even if Carter could show that Director Washington's policies exposed him to a risk of harm, he has presented no evidence that Director Washington was subjectively aware of Carter's susceptibility to heat-related illness.

### (b) Medical Director McIntyre

With regards to Dr. McIntyre, the R&R concluded that "plaintiff's testimony does not establish any personal involvement by defendant McIntyre." (R&R, PageID.712.)  The Court agrees with this conclusion.  Even if Dr. McIntyre was involved in the creation of the MDOC policy removing susceptibility to heat-related illness as a category that warranted special accommodations as Carter asserts (Compl. ¶ 25), that would not, on its own, establish personal involvement. Carter points to no evidence that this policy, which recognizes that all prisoners are susceptible to heat-related illness, specifically contributed to his unconstitutional conditions of confinement.  He also presents no evidence that McIntyre was aware of his particular susceptibility to heat-related illness or the policy's effect on his health.

### (c) ICF Deputy Warden Sanborn

The R&R dismissed Carter's claim against Sanborn as being one of essentially *respondeat superior*. (R&R, PageID.713.) Carter's complaint lays out his theory of Sanborn's liability relating to his heat reduction plan. In pertinent part, he states,

> This practice has no effect for several reasons. First, opening food slots only increases ventilation and does not reduce the heat index. Second, "upon prisoner request" leaves discretion to the officer to ignore a prisoners' request, and some officers refuse to open a prisoner's slot for personal reasons. Third a[n] officer can close a prisoner's slot for any reason they deem necessary. Fourth, mentally ill prisoners are often unable to recognize the need to make the request. And Fif[th], the "except 10 – 6 shift", is third shift when temperatures in the cell [are] at [their] high point from retaining heat throughout the day.

(Compl. ¶ 22.) Carter does not cite evidence that Sanborn was personally aware that guards were ignoring his directive. Carter objects that his complaint goes beyond a *respondeat superior* claim and asserts Sanborn is liable because his plan was inadequate as a means of mitigating extreme temperatures during heat alerts. (Pl.'s Obj. to R&R, PageID.734.) District courts in Michigan have held, most recently in the context of COVID-19, that prison officials are not liable for otherwise reasonable policies that the plaintiff finds to be inadequate as a means of mitigating health risks. *See, e.g.*, *Morris v. Washington*, 2022 WL 6601297 (E.D. Mich. May 19, 2022). Even if Carter could show that Sanborn's policy was unreasonably inadequate, he has not shown that Sanborn was subjectively aware that Carter was especially susceptible to excessive heat and heat-related illness.

### (d) Warden Davids

The R&R concluded that Carter does not have a viable claim against Warden Davids. Carter alleged in his complaint that Davids had knowledge of ventilation problems at ICF. (Compl. ¶ 15.) However, as discussed above, there is no evidence of any ventilation problems at ICF during the time period in question.

11

### (e) ICF Facility Manager Guilford

The magistrate judge concluded that a genuine dispute of material fact existed with regards to ICF Facility Manager Guilford's liability under the Eighth Amendment because "he had direct involvement with Carter's request for a fan." (R&R, PageID.714.) The magistrate judge first correctly determined that the objective prong of an Eighth Amendment claim against Guilford had been established.

> To satisfy the objective prong of an Eighth Amendment claim, Carter must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Here, the Court construes the ICF's declaration of eight heat alerts as evidence that all of the prisoners at the facility were subject to a substantial risk of serious harm due to heat related medical problems for eight days during the summer of 2020.

(*Id.*, PageID.714.) That analysis would apply to any prisoner, without reaching the question of whether Carter's conditions made him particularly susceptible to heat-related illness. Next, the magistrate judge concluded that the subjective prong, under which an official must know of and disregard an excessive risk to inmate health or safety could be satisfied. *See Farmer*, 511 U.S. at 837. In reaching this conclusion, the magistrate judge cites the fact that Carter submitted two ADA accommodation requests and that in those requests, he listed the complications he suffered from and his particular susceptibility to heat-related illness. (*See* ADA Requests. PageID.19-20.) As the ADA coordinator at ICF, Guilford would have received these ADA requests. Carter alleges that Guilford refused to process them, and there is no indication in the record that they were ever processed or that Guilford took any steps in response to the requests. Carter specifically told Guilford that,

> I suffer from MS; Hypertension; Obesity; and have a history of asthma. I have a Heart-Related illness. I am having trouble breathing, there is no exhaust vent within the cell, and I have no access to fresh [air] in temperatures above 90[] degrees.

(*Id.*, PageID.19.) In another request on August 5, Carter wrote,

12

> I suffer from Multiple Sclerosis and High Blood Pressure. I am classified high-risk for Heat-Related illness. I'm having trouble breathing, there is a lack of oxygen and fresh air because there is no exhaust vent in the cells. Temperatures are above 90 [] degrees.

(*Id*., PageID.21.)  Therefore, in contrast to the other defendants, there is sufficient evidence to submit to a jury that Guilford was subjectively aware of and disregarded an excessive risk to inmate health or safety by refusing to process Carter's request for a fan or take other action in response.

Defendant Guilford objects to this finding in full.  In support of his contention that the magistrate judge erred, Guilford points out that, "[t]he R&R relies on medical records from 2016 – four years prior to the relevant events in Carter's complaint – showing that Carter was given a fan in 2016 due to his multiple sclerosis (MS)."  (Def.s' Obj., ECF No. 54, PageID.723.)  Guilford argues that not only were the diagnoses out of date, but that at the time of the events in question, Carter no longer had special accommodations for a fan due to MS and therefore, his earlier accommodation due to particular susceptibility to heat-related illness should be ignored.  (*Id*., PageID.723-724.) Prison medical records show no change in either Carter's diagnoses or medication regime immediately prior to the summer of 2020. (Carter Med. R.s, ECF No. 36-5, Page ID. 390-394).  In Medical Director McIntyre's response to Carter's interrogatories, she indicated that hypertension, MS, and taking certain psychotropic medications can all lead to special complications in combination with extreme heat. (McIntyre Interrogs., ECF No. 36-6, PageID.443-445.)  Guilford attempts to use the lack of a special accommodation in Carter's file as evidence he was not susceptible to heat-related illness, but in the summer of 2020, no prisoners had special accommodations for susceptibility to heat-related illnesses.  In January 2020, the MDOC changed its policy, removing accommodations in special cases to reflect the fact that, "all prisoners are at risk for heat-related illness." (Washington Interrogs., PageID.513.)

13

Guilford also objects that even if he were on notice of Carter's potential danger, he did not have the discretion to give Carter a fan under existing ICF policy that prohibited fans for inmates on Level V. (Def.s' Objs. PageID.722.) Defendant cites MDOC Policy Directive 04.07.112A in support. (*Id*.) That policy allowed prisoners on Levels I, II, and IV to have a fan to combat heat, but explicitly excluded prisoners on Level V due to security concerns. (Washington Interrogs., PageID.513.) However, that policy had an effective date of April 2021. (*Id*.) The events complained about occurred in the summer of 2020. Plaintiff also alleges in his verified complaint that at least one other prisoner on Level V was allowed access to portable fans that summer as an accommodation for special heat susceptibility. (Compl. ¶ 30.) If true, this suggests that it was within the discretion of the prison staff to allow certain inmates on Level V to possess fans. Accordingly, the magistrate judge did not err in allowing the Eighth Amendment claim against Guilford to go forward. There is a genuine dispute of material fact as to what the prison policy was and whether it was within the discretion of prison staff to grant inmates on Level V access to fans.

### B. ADA and RA Claims

Carter brings claims under Title II of the ADA, 42 U.S.C. §§ 12131-12165, as well as under the Rehabilitation Act. Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, because of that disability, 'be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" 591 F.3d at 481-83 (quoting 42 U.S.C. § 12132). In order to establish a claim under Title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that defendant is subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of plaintiff's disability. *See Tucker v. Tennessee*, 539 F.3d 526, 232-33 (6th Cir. 2008);

14

*see also Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003). The Supreme Court has held that Title II applies to state prisoners and inmates. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998).

A person is disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [has] a record of such an impairment; or [is] regarded as having such an impairment." 42 U.S.C. §§ 12102(2)(A)-(C). This impairment must "substantially limi[t] the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Similarly, § 504 of the RA provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). "Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act … claims brought under both statutes may be analyzed together." *Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (citing *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n. 2 (6th Cir. 1995)).

The magistrate judge found that a genuine issue of material fact existed as to first, the existence of a qualifying disability under the ADA, and second, as to whether "as a reason of such a disability" Carter was "excluded from participation in" or denied the benefits or the services, programs, or activities of a public entity." 42 U.S.C. § 12132. In reaching this conclusion, the

15

magistrate judge determined that Defendants had not met their burden of proving that MS did not count as a qualifying disability. (R&R, PageID.718.) The magistrate judge also found that housing the defendant in a manner that did not threaten his health was a service provided by the MDOC (*Id.*, PageID.719.) Defendants raise two objections to the R&R on the issue. First, they argue that the "conclusion that Plaintiff has a qualifying disability under the ADA/RA is contrary to the record." (Def.s' Obj., PageID.724.) They also object that "the R&R did not recommend dismissing Carter's ADA/RA claims against them in their individual capacit[ies]." (*Id.*, PageID.725.)

Taking each in turn, Defendants' main argument is that Carter's MS diagnosis did not qualify as a disability at the time of the complained-of events. (*Id.*) Defendants take issue that the R&R "again relies on the 2016 record, where Carter was given a fan accommodation for MS." (*Id.*). They further assert that "[i]n 2020, Carter's uncontested medical records show that he was not regarded as having a physical or mental impairment limiting a major life activity related to being 'sensitive to heat' or having 'heat-related complications' due to other medical conditions." (*Id.*) Defendants' use of these records to support their argument is undercut by the fact that, as previously discussed, it would have been impossible for Carter to have a special accommodation for susceptibility to heat-related illness in his records in July and August 2020 because the MDOC changed their policy to eliminate heat susceptibility as a protected category warranting accommodations in January 2020. (Washington Interrogs., PageID.513.) Despite the change in policy, Defendant McIntyre admitted that "[f]or some people with MS increases in core body temperature results in an appearance or worsening of symptoms of MS." (McIntyre Interrogs., PageID.505.) A special accommodation record is not the only way to prove a disability. As the magistrate judge pointed out, "[w]hile the MDOC changed its operating procedures to exclude

individual special accommodations for heat-related illnesses, Carter's diagnosis of MS did not change." (R&R, PageID.719.)  Here, there is enough evidence that Plaintiff suffered from a qualifying disability at the time of the complained-of incidents to survive a motion for summary judgment.

### 1. ADA/RA Claims Against Defendants in their Individual Capacities

Defendants' final objection is that the R&R fails to dismiss Carter's claims under the ADA and RA against Defendants in their individual capacities. Defendants, for the first time, object that,

> [t]he R&R discusses how proper defendants in ADA/RA claims are against public officials only in their official capacities. (R&R, ECF No. 53, PageID.718) (citing *Everson v. Leis*, 556 F.3d 484, 5001[sic] fn. 7 (6th Cir. 2009)). The R&R then discusses that Carter is suing all Defendants in their official, as well as individual capacities.

Defendants should have presented this issue to the magistrate judge. The Court will not consider it for the first time in Defendants' objections.

### V. PLAINTIFF'S REQUEST FOR SUPPLEMENTAL OBJECTIONS

Carter requests permission to file supplemental objections with the Court. He asserts that he was suffering from MS-related pain and delusions at the time he submitted his original objections and should therefore be allowed to supplement his objections with information that has since occurred to him.  Under the Federal Rules of Civil Procedure, "when an act may be done within a specific time, the court may, for good cause, extend that time." Fed. R. Civ. P. 6(b).  The information Carter wishes to add relates to his answers to deposition questions during discovery. (Carter Motion to File Supplemental Obj.s, ECF No. 58, PageID.747.)  Carter could have raised these issues in response to the summary judgment motion or in his original objections but failed to do so. Therefore, the Court will deny his request to submit supplemental objections because Carter has not shown good cause.

## VI. CONCLUSION

For the reasons stated above, the Court will deny Carter's motion for summary judgment in full. The Court will grant summary judgment to Washington, McIntyre, Davids, and Sanborn as to Carter's Eighth Amendment claim and deny summary judgment to Guilford on the same. The Court will also deny Washington, McIntyre, Davids, Sanborn, and Guilford's motions for summary judgment as to the ADA and RA claims against them acting in their official and individual capacities. Finally, the court will deny Carter's request to file supplemental objections as untimely. After granting summary judgment, the remaining claims are Carter's claims under the Eighth Amendment against Guilford and his claims under the ADA and the RA against Defendants Washington, McIntyre, Davids, Sanborn, and Guilford. The Court will enter an order in accordance with this Opinion.

Dated: September 13, 2023         /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE